*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Adoption of | ) |
| | ) Supreme Court No. S-18052 |
| J.R.S. | ) |
| | ) Superior Court No. 3AN-20-00655 PR |
| | ) |
| | ) O P I N I O N |
| | ) |
| | ) No. 7585 – March 4, 2022 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Yvonne Lamoureux, Judge.

Appearances: John J. Sherman, Sherman Law Office, LLC, Anchorage, for Appellants Randi B. and Bradley B. Jennifer M. Coughlin, Landye Bennett Blumstein, LLP, Anchorage, for Appellee Dale S.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

WINFREE, Chief Justice.

## I.  INTRODUCTION

A maternal aunt and uncle sought to adopt a child over the father's objection; after finding that the father's consent was required, the superior court dismissed the adoption petition. The aunt and uncle contend the superior court erred by finding that: (1) the father had justifiable cause for his failure to communicate with the child for one year or more; (2) the father did not abandon the child for six months or more; and (3) the father did not fail to support the child for one year or more.

Following oral arguments we issued a brief order affirming the superior court's decision dismissing the adoption petition. This opinion sets forth the reasons for our earlier order.

## II.    FACTS AND PROCEEDINGS

### A.    Background

J.R.S. was born in August 2016.[1] Her parents, Dale S. and Samantha S., have a history of substance abuse, including heroin and methamphetamine.

### B.    Proceedings

#### 1.    Proceedings generally

In April 2019 J.R.S.'s maternal aunt and uncle, Randi and Bradley B., petitioned for sole legal and primary physical custody of J.R.S. They alleged "that [J.R.S.] ha[d] lived with them continuously since July . . . 2018, that the . . . parents' rights have been suspended by circumstances (specifically due to substance abuse issues), and that the . . . parents had abandoned [J.R.S.]" Dale responded to the petition and requested that he and Samantha be awarded custody. The court held an initial status hearing in May; only Randi, Bradley, and Samantha participated. The court granted Randi and Bradley's unopposed motion for interim custody of J.R.S.

In December Dale attempted to mediate the custody dispute with Randi and Bradley. Dale later testified that the mediation was unsuccessful because he was unwilling to "sign over [his] daughter." Dale explained that Randi and Bradley had offered to allow visitation with J.R.S. if Dale agreed to grant them custody and to attend substance abuse treatment. Dale acknowledged that he had tested positive for

---

[1]    We use initials to protect the child's privacy. The petition was captioned *In the Matter of the Adoption of J.R.B.*, using the aunt and uncle's last initial. Because the adoption petition was denied, the child will keep her birth name; we accordingly refer to her as J.R.S.

methamphetamine and heroin in June and that he had not attended substance abuse treatment.

In March 2020 Randi and Bradley petitioned to adopt J.R.S. The court ordered that the custody and adoption cases be heard together and bifurcated the trial; the first part took place in December and addressed whether the adoption required the parents' consents. Randi and Bradley sought to prove that consent was not required because the parents had: (1) failed to communicate meaningfully with J.R.S. without justifiable cause for one year or more; (2) abandoned J.R.S. for six months or more; and (3) failed to provide for J.R.S.'s care and support as required by law or judicial decree without justifiable cause for one year or more.[2] The court found that Samantha's consent to adoption was not required but that Dale's consent to adoption was required, and it accordingly dismissed the adoption petition.

Randi and Bradley appeal, asserting that the superior court erred by finding that Dale's consent was required.

### 2. Testimony and superior court findings about whether Dale failed to communicate without justifiable cause or abandoned J.R.S.

#### a. August 2016 through April 2018

Trial testimony indicated that after J.R.S.'s August 2016 birth she lived with Dale and Samantha until about June 2017. Samantha's mother testified that Samantha and J.R.S. lived with her from June until November 2017. Samantha's father testified that J.R.S. then lived with him until approximately April 2018.

The parties dispute whether Dale had contact with J.R.S. between June 2017 and spring 2018. Dale testified that he had several video chats with J.R.S. between

---

[2] *See* AS 25.23.050(a)(1)-(2) (enumerating exceptions to requirement for biological parents' consent to child's adoption).

June and November, but Samantha's mother testified that, although Dale and Samantha had been in contact, she could not remember seeing or hearing from Dale while J.R.S. lived with her. Dale testified that in January 2018 he started an oilfield job in North Dakota, working a varying schedule of weeks in the field and returning to Alaska for his time off. Dale testified that in late January or early February 2018 he had visited Samantha and J.R.S. a few times and that they went to a park or shopping, but Samantha's father testified that he did not see Dale from November 2017 to April 2018. The superior court found that Dale had contact with J.R.S. prior to April 2018.

### b.    April 2018 through November 2018

Samantha was undergoing cancer treatment throughout 2018. Samantha's mother testified that in April she picked up J.R.S. from Samantha's father's home and that she offered to care for J.R.S. until Samantha got better. Randi testified that J.R.S. began living with her and Bradley in July.

Testimony reflected that Dale had multiple visits with J.R.S. during the summer and fall of 2018. Samantha's mother testified that Dale attended a family gathering at a restaurant in May. Samantha's mother further testified that Dale also attended a family gathering for J.R.S.'s birthday in August. Randi testified that early in the summer J.R.S. lived with Samantha and Dale at Samantha's father's home when Dale was in town but that around August they agreed it would be best for J.R.S.'s sleep schedule for her to spend days with Samantha and Dale and return to Randi and Bradley's home at night. Randi testified that in October and November she twice told Samantha and Dale that future visits with J.R.S. needed to be supervised because of their fighting. Randi also testified that at the end of November she blocked calls from Dale's number and told Samantha that Dale could coordinate supervised visits with J.R.S. through Samantha's mother.

### c. November 2018 through trial

Dale testified that he tried contacting Samantha's mother and Randi multiple times in early 2019 and that neither one responded. Samantha's mother testified that in March she exchanged texts and phone calls with Dale; he wanted to take J.R.S. to Wasilla to visit his family, but he would not agree to supervision. Randi testified that she unblocked Dale's calls in March and that she told him she knew he had been trying to contact her. She testified that Dale indicated he wanted to take J.R.S. to Wasilla to visit his family and his brother would be willing to supervise. Randi asserted that she told Dale she wanted to meet his brother, that she tried to arrange a meeting, but that Dale did not follow through and the meeting never happened.

Randi testified that in March she went to see Samantha; the superior court found that Dale and Samantha were both living at Samantha's father's home at this time. Randi testified that she observed bruising on Samantha and drug paraphernalia in the home. Randi said that shortly after this visit, she made a report to the Office of Children's Services (OCS).[3] Randi and Bradley also filed a petition for legal custody of J.R.S., and in April the court granted them temporary custody of J.R.S.

Randi testified that Dale contacted her in April after she made the OCS report and filed the custody petition; he asked to see J.R.S., and Randi told him he would

---

[3]    OCS's mission is to "[e]nsur[e] the safety, permanency and well-being of children by strengthening families, engaging communities, and partnering with Tribes." *Office of Children's Services: Mission, Vision, Guiding Principles and Values*, ALASKA DEP'T OF HEALTH & SOC. SERVS., https://dhss.alaska.gov/ocs/Pages/aboutus/default.aspx (last visited Dec. 16, 2021).

An OCS caseworker later testified that: OCS received a report alleging that Dale and Samantha neglected J.R.S.; the caseworker talked to Samantha on the phone once but never talked to Dale; the caseworker never met with either parent; OCS was "not legally involved or setting up visits"; and because the child was in someone else's temporary custody and there was an open custody case, OCS closed its file.

need to go through OCS to coordinate a visit. Randi further testified that Dale contacted her again in June asking to see J.R.S. and that she again told him he would need to coordinate visits through OCS. Randi also stated that on J.R.S.'s birthday in August, Dale left a message asking her to say happy birthday to J.R.S. Randi testified that was the last time she heard from Dale.

Dale testified that he first learned about the custody petition when his mother called him in North Dakota to let him know that Randi and Bradley had been awarded temporary custody. Dale explained that he had not received notice because the paperwork had been sent to Samantha's father's address, Dale then was working in North Dakota, and when he was not working he was not living at Samantha's father's house. Dale stated that as soon as he got back to Alaska he went to the courthouse and filed an answer. He also testified that he worked overtime for several months to save enough money to hire an attorney. Dale asserted that, despite repeated requests, his attorney refused to file a request for interim visitation and that the attorney advised him not to contact Randi and Bradley directly. The superior court found Dale's testimony on this issue credible, noting: "Dale . . . followed the advice of his attorney and stopped contacting the maternal relatives in order to facilitate visitation with [J.R.S.]"

The superior court found that during 2018 J.R.S. had not lived with either of her parents since spring, that J.R.S. had been in Randi and Bradley's physical custody since July, and that Dale had not had contact with J.R.S. since November.

### 3.    Evidence and findings about whether Dale failed to support J.R.S.

The court found: "[J.R.S.]'s extended maternal family members have been supporting [J.R.S.] her entire life. They have been providing housing, food, diapers, and clothes for [J.R.S.]" Samantha's father, Samantha's mother, and Randi all testified that

during the periods when J.R.S. was living with each of them they financially supported her.  Randi further testified that Dale never purchased anything "of substance" for J.R.S.

In May 2017 Samantha obtained an administrative child support order from the Alaska Department of Revenue, Child Support Services Division (CSSD).  The order required Dale to pay Samantha monthly child support starting in June, including arrears from October 2016 through May 2017.  CSSD records show that Dale made 20 payments between February 2018 and February 2021.  Dale testified that he believed the child support payments were going to Randi and Bradley after J.R.S. began living with them.

## III.    STANDARD OF REVIEW

"A finding that a parent's failure to communicate or support a child was without justifiable cause is a finding of fact that we review for clear error."[4]  Whether a parent abandoned a child for at least six months is also a finding of fact that we review for clear error.[5]  "A factual finding is clearly erroneous 'when a review of the record leaves the court with a definite and firm conviction that the superior court has made a mistake.' "[6]  "The superior court's 'factual findings enjoy particular deference when they are based "primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence." ' "[7]

---

[4]      *Bruce L. v. W.E.*, 247 P.3d 966, 973 (Alaska 2011).

[5]      *See In re Adoption of S.F.*, 340 P.3d 1045, 1048 (Alaska 2014) (reviewing superior court's abandonment finding for clear error).

[6]      *Id.* at 1047 (quoting *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002)).

[7]      *Id.* (quoting *William P. v. Taunya P.*, 258 P.3d 812, 814 (Alaska 2011)).

## IV. DISCUSSION

Under AS 25.23.040, both parents' consent is required for the adoption of their child unless an enumerated exception applies. The three exceptions at issue in this case are set out in AS 25.23.050(a)(1)-(2), which provides that consent is not required if a parent has: (1) failed without justifiable cause to communicate meaningfully with the child for one year or more; (2) abandoned the child for six months or more; or (3) failed without justifiable cause to provide for the care and support of the child as required by law or judicial decree for one year or more. Trial courts are to "strictly construe AS 25.23.050 in favor of the natural parent."[8] "[A]doption consent provisions are designed to protect the natural rights of parents to custody, society, comfort, and services of the child. . . . [P]arents should not be deprived of the fundamental rights and duties inherent in the parent-child relationship except for 'grave and weighty reasons.' "[9] "The long-established and continuing rule in Alaska is that absent the element of willfulness, a parent does not lose the right to consent under AS 25.23.050(a)(2)."[10]

### A. The Superior Court Did Not Clearly Err By Finding That Dale Made Reasonable Efforts To Communicate With J.R.S.

Alaska Statute 25.23.050(a)(2)(A) provides that a parent's consent to adoption is not required if the parent "has failed significantly without justifiable cause . . . to communicate meaningfully with the child" for a period of at least one year. This exception is analyzed using a burden-shifting test:

---

[8]    *In re Adoption of A.F.M.*, 960 P.2d 602, 604 (Alaska 1998) (quoting *S.M.K. v. R.G.G.*, 702 P.2d 620, 623 (Alaska 1985)).

[9]    *Id.* (alterations in original) (quoting *D.L.J. v. W.D.R.*, 635 P.2d 834, 837 (Alaska 1981)).

[10]    *Ebert v. Bruce L.*, 340 P.3d 1048, 1055 (Alaska 2014) (quoting *In re Adoption of J.M.F.*, 881 P.2d 1116, 1118 (Alaska 1994)).

The burden falls on the adoptive parents . . . to prove by clear and convincing evidence that communication . . . did not occur for that one-year period. Once this showing is made, the burden shifts to the biological parent to produce evidence of justifiable cause for the failure in communication . . . . If the biological parent meets the burden of production, the adoptive parents then must show by clear and convincing evidence that the failure in communication . . . was without justifiable cause.[11]

The superior court found that Dale had failed to communicate with J.R.S. for longer than one year. Under AS 25.23.050(a)(2)(A) the burden shifted to Dale to "produce evidence of justifiable cause"; Randi and Bradley then were required to establish "by clear and convincing evidence that the failure . . . was without justifiable cause."[12]

"A parent's failure to communicate with his child is justified only if his 'efforts to communicate were objectively reasonable in light of the existing circumstances.' "[13] We also have noted that "[s]eeking the assistance of a court can indicate a parent's interest in preserving his relationship with his child" and can thus constitute reasonable efforts.[14] In *Bruce L. v. W.E.* the father had no contact with the

---

[11]     *Bruce L. v. W.E.*, 247 P.3d 966, 979-80 (Alaska 2011) (footnotes omitted).

[12]     *See id.*

[13]     *David S. v. Jared H.*, 308 P.3d 862, 868 (Alaska 2013) (footnote omitted) (quoting *In re Adoption of B.S.L.*, 779 P.2d 1222, 1224 (Alaska 1989)).

[14]     *Bruce L.*, 247 P.3d at 980-81; *see also S.M.K. v. R.G.G.*, 702 P.2d 620, 624 (Alaska 1985) ("[The mother] showed her interest in preserving her relationship with [her son] by seeking the assistance of . . . the . . . courts, as well as several attorneys. These efforts were reasonable and practical given the facts of this case.").

child for the first year of the child's life.[15] But during that year the father "commenced pro se legal proceedings by moving to be a party in the . . . initial adoption case and to be granted custody"; "represented himself at a hearing on the initial adoption petition to request custody" of the child; acquired court-appointed counsel and moved for paternity testing; filed a pro se custody suit; and requested a hearing in the custody suit.[16] We determined that the father had "clearly made reasonable efforts to obtain custody and to develop a relationship with" the child and that the prospective adoptive parents had not met their burden of proving by clear and convincing evidence that the father had unjustifiably failed to communicate with the child for one year.[17]

When deciding whether efforts to communicate were reasonable, we also consider the child's age; we have found justifiable cause for a parent's failure to communicate if "the child is too young to read or [to] communicate over the telephone."[18] In *D.L.J. v. W.D.R.*, for example, we upheld a determination that a father's failure to communicate for two and a half years with his daughter — who was three years old when he last visited — was justified because, among other things, the father could not meaningfully communicate with such a young child "by letter or telephone without the mother's cooperation."[19] And in *D.A. v. D.R.L.* we upheld a similar determination

---

[15]     247 P.3d at 980.

[16]     *Id.* at 981.

[17]     *Id.*

[18]     *David S.*, 308 P.3d at 872 (quoting *D.A. v. D.R.L.*, 727 P.2d 768, 770 (Alaska 1986)).

[19]     635 P.2d 834, 836, 839 (Alaska 1981).

because "the child was too young to talk on the telephone or understand gifts or letters from her father."[20]

The superior court found Dale's participation in the custody and adoption cases constituted "reasonable efforts to obtain custody and to reunite with his daughter." The court also found reasonable Dale's focus on in-person visitation over phone calls or video chats, noting that there was "a clear disagreement likely since approximately November 2018, but definitely since March 2019, about whether [J.R.S.]'s contact with Dale . . . must be supervised. Dale . . . reasonably assumed that these court cases would resolve that disagreement." And the court found that Dale was advised by his attorney to stop contacting J.R.S.'s maternal relatives about visitation pending the court proceedings' outcome. The superior court determined that there was "not clear and convincing evidence that . . . [Dale's] failure to communicate meaningfully with [J.R.S.] was without justifiable cause."

Randi and Bradley contend the superior court erred by finding that Dale's participation in the legal proceedings constituted reasonable efforts to communicate with J.R.S. Seeking to distinguish the parent's efforts in *Bruce L.*,[21] a case Randi and Bradley characterize as the parent having "actively pursued custody or visitation from the beginning of the child's life" and taken "proactive steps towards securing contact with the child," they contend Dale merely filed an answer to the custody petition, his "case was plagued by his failure to communicate with his attorneys," and he did not seek visitation while the case was pending. They assert that Dale's testimony about his attorney being unwilling to request visitation or interim custody was not credible. They also assert that Dale acted unreasonably by failing to accept supervised visitation and

---

[20]     727 P.2d at 770.

[21]     *See* 247 P.3d at 980-81 (describing father's efforts).

failing to coordinate visits through OCS, pointing out that until May 2019 nothing prevented Dale from legally taking custody of J.R.S. Randi and Bradley analogize this case to *In re Adoption of B.S.L.* and *David S. v. Jared H.*, cases in which we upheld findings that a parent had failed to make reasonable efforts to communicate with a child.[22] They argue that, like in those cases, Dale had "avenues open to establish meaningful contact" with J.R.S., but he "failed to . . . avail [himself] of those avenues."

Randi and Bradley's burden to show a lack of justification by clear and convincing evidence and our deferential standard of review set a high bar for them to overcome the superior court's determination.[23] The court's findings are factual in nature and will not be overturned unless clearly erroneous.[24] We have on several occasions emphasized this deferential standard of review in upholding determinations regarding

---

[22] *In re B.S.L.*, 779 P.2d 1222, 1224-26 (Alaska 1989) (upholding finding that mother did not make reasonable efforts to communicate; mother did not attempt to contact child because she believed attempts to communicate would be blocked by child's father's family, with whom child lived, and, although mother spoke to attorneys about obtaining custody, she did not initiate proceedings); *David S.*, 308 P.3d 862, 869-70, 872-73 (Alaska 2013) (upholding finding that father did not make reasonable efforts to communicate; he made no real attempts to contact child, alleged no active interference with communication by custodial relatives, and despite incarceration he maintained communication with people other than child).

[23] *See Bruce L.*, 247 P.3d at 979-80 (explaining that adoptive parents must prove "by clear and convincing evidence" failure of communication or support for one year, that biological parent then must provide justifiable cause for the failure, and that "the adoptive parents then must show by clear and convincing evidence that the failure in communication or support was without justifiable cause").

[24] *See, e.g., David S.*, 308 P.3d at 867 ("We review the superior court's factual findings in an adoption proceeding for clear error.").

AS 25.23.050(a)'s consent exceptions.[25] Dale's efforts are not unlike those of the father in *Bruce L.*[26] Upon learning that Randi and Bradley were seeking custody of J.R.S., Dale promptly went to the courthouse and filed an answer. Dale testified that he worked overtime to save enough money to hire an attorney to help him contest the custody proceedings. After Randi and Bradley petitioned for adoption, Dale requested court-appointed counsel to contest the adoption proceedings. Dale participated in the December 2019 custody mediation and, with one exception, all of the scheduled hearings relating to J.R.S.'s custody. The superior court acknowledged that J.R.S. was old enough to recognize voices on the telephone and participate in video chats. But the record does not suggest that Dale would have been successful even had he attempted to engage in video chats or phone calls; Dale testified that he had frequently tried contacting both Samantha's mother and Randi but received no responses, and Randi testified that she blocked Dale's number for over three months. As in *D.L.J.*, meaningful

---

[25]    We have noted that superior courts may properly reach different conclusions on similar sets of facts without erring. *In re B.S.L.*, 779 P.2d at 1225 n.3 ("[E]ven if the facts . . . were identical it would not follow that the trial court's finding in this case should be set aside as clearly erroneous. The trial court heard lengthy, in-court testimony . . . [and] it rendered a careful and thoughtful decision. The clearly erroneous standard demands that we defer to the trial court in this matter . . . ."); *cf. D.L.J. v. W.D.R.*, 635 P.2d 834, 839 (Alaska 1981) ("Though the natural father could have been more enterprising, in the circumstances of this case we cannot say that the master's determination that his failure to communicate with his daughter was justified was clearly erroneous.").

[26]    *See Bruce L.*, 247 P.3d at 980-81 (finding that father did not unjustifiably fail to communicate because he was actively involved in court proceedings regarding custody and adoption of his son).

communication with such a young child could not be accomplished without the custodial party's cooperation.[27]

The record amply supports the determination that Dale's failure to communicate was not unreasonable or without justification, and the superior court did not clearly err in its determination.

**B. The Superior Court Did Not Clearly Err By Finding That Dale Did Not Abandon J.R.S.**

A parent's consent to a child's adoption is not required if the parent "has abandoned a child for a period of at least six months."[28] "Abandonment is established [if] a parent's 'conscious disregard of the obligations owed by a parent to the child, lead[s] to the destruction of the parent-child relationship.' "[29]

The superior court found that Dale's "actions do not rise to the level of a conscious disregard of his parental responsibilities." The court noted that "there have been periods of time when Dale . . . was an absent parent, [but] none of those periods lasted six consecutive months."

Randi and Bradley contend that Dale abandoned J.R.S. from November 2018 until the date of the trial, offering no arguments other than those previously discussed in the context of Dale's failure to communicate. They additionally contend that Dale abandoned J.R.S. from June 2017 until April or May 2018. They point to Samantha's mother's testimony that she did not see Dale during the period from June to November 2017 and to Samantha's father's testimony that he did not see Dale from

---

[27]     *See* 635 P.2d at 839.

[28]     AS 25.23.050(a)(1).

[29]     *In re Adoption of S.F.*, 340 P.3d 1045, 1047 (Alaska 2014) (second alteration in original) (quoting *D.M. v. State*, 515 P.2d 1234, 1237 (Alaska 1973)).

November 2017 to April 2018. Randi and Bradley assert that Dale's testimony about video chats and some in-person visits with J.R.S. during this time was not credible.

Dale testified that he made continual efforts to see J.R.S. during the first two years of her life, when she was living with Samantha and Samantha's relatives. Following Dale's November 2018 visit with J.R.S., he periodically contacted Samantha's mother and Randi trying to arrange visits. Dale testified that he focused on communicating with Randi because he "was under the assumption that [his] daughter was living with Randi," but Randi had Dale's number blocked on her phone until March 2019. And, as discussed more fully above, Dale filed an answer to Randi and Bradley's custody petition in April 2019 and continued participating in the ongoing legal proceedings regarding J.R.S.'s custody and adoption. The court found credible Dale's testimony that he had in-person and video visits with J.R.S. and that there was no six month period when Dale "was an absent parent."

Randi and Bradley ask us to reweigh evidence and reach a different factual conclusion than the superior court. We will not reweigh evidence if the record provides support for factual findings.[30] The court's factual finding that Dale did not abandon J.R.S. for six months is supported by the record and thus is not clearly erroneous.

---

[30] *In re Adoption of Hannah L.*, 390 P.3d 1153, 1156 (Alaska 2017) ("When reviewing factual findings we ordinarily will not overturn a trial court's finding based on conflicting evidence, and we will not re-weigh evidence when the record provides clear support for the trial court's ruling; it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence." (quoting *In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009))); *see also In re S.F.*, 340 P.3d at 1047 ("The superior court's 'factual findings enjoy particular deference when they are based "primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence." ' " (quoting *William P. v. Taunya P.*, 258 P.3d 812, 814 (Alaska 2011))).

**C.    The Superior Court Did Not Clearly Err By Finding That Dale Did Not Willfully Fail To Support J.R.S.**

Under AS 25.23.050(a)(2)(B) a parent's consent to adoption is not required if the parent has willfully and without justifiable cause failed significantly for a period of at least one year "to provide for the care and support of the child as required by law or judicial decree."[31]   The burden is on the person seeking to adopt the child to "prove by clear and convincing evidence that the natural parent failed to support the child."[32]

The superior court found that "[J.R.S.]'s extended maternal family members have been supporting [J.R.S.] her entire life" including by "providing housing, food, diapers, and clothes."   The court nonetheless found that "there is not clear and convincing evidence that Dale . . . failed to support [J.R.S.] as required by law or judicial decree."   The court noted that Dale made numerous child support payments under an administrative child support order and that those payments "do not reflect a failure to provide support for a period of at least one year."   The court found: "Randi and Bradley . . . never requested child support from Dale . . . and never filed an application for services with CSSD.   Dale . . . assumed that the payments which were made under the administrative child support order were going to Randi and Bradley . . . ."

Randi and Bradley contend that Dale should have directed child support payments to them after they began caring for J.R.S. in July 2018 and that his failure to pay them support constitutes a failure without justifiable cause to provide support.   They assert:   "It cannot be the rule that an adoptive parent must make efforts to force a

---

[31]    *See Ebert v. Bruce L.*, 340 P.3d 1048, 1055 (Alaska 2014) ("The long-established and continuing rule in Alaska is that absent the element of willfulness, a parent does not lose the right to consent under AS 25.23.050(a)(2)." (quoting *In re Adoption of J.M.F.*, 881 P.2d 1116, 1118 (Alaska 1994))).

[32]    *In re J.M.F.*, 881 P.2d at 1118.

biological parent to support a child in their care." But we have held that a parent does not willfully fail to provide support without justifiable cause if the adoptive parents do not ask for support. In *In re Adoption of J.M.F.* the adoptive parents did not ask for or expect support payments, and the parent testified that she would have been willing to provide support had the adoptive parents asked; we upheld the superior court's determination that failure to support the child was justifiable and not willful.[33] More recently, in *Ebert v. Bruce L.* the adoptive parents "neither needed nor asked for any support," the father had minimal income but testified he would have paid support if asked, and the father testified he was unaware he had any obligation to pay support to the adoptive parents; we affirmed the superior court's finding that the father did not fail to support the child.[34]

Like in *J.M.F.* and *Ebert*, Randi and Bradley did not ask Dale to pay support nor did they filed an application with CSSD. And Dale was making child support payments to CSSD; he testified that he believed CSSD "was doing [its] job and making sure that money got to where it needed to be." The superior court's finding that AS 25.23.050(a)(2)(B) did not apply to Dale thus is not clearly erroneous.

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's decision dismissing the adoption petition.

---

[33]     *Id.*

[34]     340 P.3d at 1055.